```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

POWER MARINE INVESTMENTS, LLC           *      CIVIL ACTION
AND COMMONWEALTH INSURANCE CO.          *
                                        *
VERSUS                                  *      NO. 10-862
                                        *
S.H.R.M. CATERING SERVICES, INC. D/B/A  *
EUREST SUPPORT SERVICES, INC. AND       *
LEXINGTON INSURANCE CO.                 *      SECTION "B"(5)
```

### ORDER AND REASONS

Before the Court is Plaintiff's Motion for Summary Judgment seeking enforcement of the terms of agreements between the parties, an order requiring defendants indemnify plaintiffs for $350,000.00 spent to resolve an underlying claim and stating that they were entitled to a defense. (Rec. Doc. No. 29). Defendants have filed an opposition thereto at Rec. Doc. No. 36. For the reasons pronounced below,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Rec. Doc. No. 29) be and is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Rec. Doc. No. 40), as it presents arguments and addresses issues almost identical to those in Plaintiffs' Motion for Summary judgment, is **DENIED**.

### I. *Cause of Action and Facts of Case*

This case arises out of injuries sustained by Samuel Thomas to

1

his leg and right ankle while in the course and scope of his employment as a Jones Act seaman on or about April 18, 2005. At the time, Thomas was employed as a steward/cook aboard the M/V Dixie Patriot by Defendant SHRM. Following complications from surgery to address those injuries, Thomas passed away on December 19, 2005. The following September, his widow filed suit; that suit, "the Thomas litigation," settled and this Court issued an order of dismissal on March 7, 2009.[1] Power Marine tendered a defense and requested indemnity of SHRM and SHRM's insurer Lexington but neither acted upon the request. *Id*. Subsequently, as part of the of the Thomas litigation, Plaintiff Commonwealth Insurance Company ("Commonwealth") settled Thomas' claims against Power Marine for $350,000.00. (Rec. Doc. No. 29-1 at 15). Plaintiffs now seek indemnity for the amount paid in accordance with two contracts, the first an "Operating Agreement" ("OA") executed by Power Marine and Danos and Curole Marine Contractors, LLC ("D&C"), the other a "Master Service Contract" ("MSC") between D&C and defendant, SHRM Catering Services.[2] (Rec. Doc. Nos. 29-2, 29-4). The OA's choice of law provision states that the OA "shall

---

[1] For a detailed description of the background of Mr. Thomas' injuries see this Court's Order denying in part and granting in part SHRM's Motion for Summary Judgment in the Thomas litigation, *Jerzelle M. Thomas v. SHRM Catering Services, Inc., Et Al.*, 07-1177 at Rec. Doc. No. 140.

[2] The OA was executed on December 23, 2003, and via a series of mutually agreed to amendments extending the OA's expiration date, expired on December 31, 2005. (Rec. Doc. No. 29-2 at 10, 11-13). The MSC became effective between the parties thereto on September 16, 2004. (Rec. Doc. No. 29-4 at 1).

2

be deemed to be a contract made under the admiralty and maritime laws of the United States" and interpreted accordingly. (Rec. Doc. No. 29-2 at 9).  The MSC does not contain a choice of law provision.

The M/V Dixie Patriot was owned by Plaintiff Power Marine Investments, LLC ("Power Marine") and, by the terms of the OA, D&C was appointed to "manage, operate, maintain, oversee and supervise the chartering, crewing, provisioning, maintenance and repair of the Vessel . . . ." (Rec. Doc. No. 29-2 at 1).  Additionally, D&C was to provide other services necessary for the operation of the vessel, those expenses were to be paid by Power Marine. *Id*. at 9. In actuality, Power Marine reimbursed D&C for those expenses covered under that provision of the OA; in addition to reimbursements, Power Marine paid D&C an operator's fee of eight thousand dollars per month and five percent "of the gross revenues (including all services and subsistence charged by the Vessel) collected during the month for services by the Vessel pursuant to [the OA]." (Rec. Doc. No. 29-2 at 6).  D&C's Vice President, John Mulvihill stated in his deposition that revenues from operation of the boat were deposited into a joint account with both Power Marine and D&C's names on the account. (Rec. Doc. No. 29-3 at 29).  Mr. Mulvihill agreed that "transfers were made from that joint operating account to both Power [Marine] and [D&C]." *Id*.  In response to the question "Would you say, based upon your

relationship, that [D&C], under [the OA], was working for Power Marine or with Power Marine?" Mr. Mulvihil answered "I would say with." *Id.* at 29-30.

Section 3(d) of the OA requires D&C as "operator" to "use its bets effort to obtain 'knock for knock' agreements from third parties/invitees boarding the vessel for any purpose that releases owner, operator and the vessel from and against any and all claims for liabilities for property damage, injury and death." (Rec. Doc. No. 29-2 at 2).

D&C, in order to provide the crew with food, executed the MSC with SHRM to provide catering services, the language of the MSC is central to the arguments of the parties. The MSC contains two sections on which both parties focus their arguments, sections eight and fourteen. Throughout the MSC, SHRM is refereed to as "Contractor". (Rec. Doc. No. 29-4 at 1). Section eight states, in pertinent part:

   8. INSURANCE

   (A) Contractor and all of Contractor's contractors shall maintain the insurance set forth on the attached "Danos & Curole Marine Contractors, L.L.C. Minimum Insurance Requirements."

   (B) Notwithstanding the provisions of the attached Minimum Insurance Requirements, all insurance policies maintained by Contractor and Contractor's contractors shall be endorsed as follows:

      (1) "(a) Danos and Curole Marine Contractors, L.L.C., (b) its subsidiaries and affiliated companies and the owners, co-owners, and joint venturers associated therewith, if any, *(c) parties for whom or with whom*

> *Danos and Curole is working*, and (d) employees, officers, directors and agents of (a), (b) and (c) are named as Additional Insureds (herein otherwise referred to as Company Group. (Except the workmen's compensation policy)

Rec. Doc. No. 29-4 at 3.[3] The indemnity provision of the MSC, again referring to SHRM as "contractor" found at section 9(A) states:

> A. Contractor covenants and agrees to fully defend, indemnify and hold harmless Company Group and the insurer thereof from and against any and all losses, claims, demands, liabilities or cause of action of every kind and character for damages (including, but not limited to, bodily injury, illness, disease, death, loss of service, loss of society, maintenance, cure, wages or property) which may be made or asserted by Contractor, its subsidiaries and affiliate companies, any subcontractor of Contractor, their agents, employees . . . on account of personal injury or death caused by, arising out of, or in any way incidental to or in connection with the performance of the work . . . hereunder, regardless of the cause of such personal injury, death . . .even though occasioned, brought about, or caused in whole or in part by the negligence of any member of Company Group or the unseaworthiness of any vessel owned, operated or contracted by the Company Group or by any defective condition of any equipment of Company Group (whether or not existing prior to the date of this agreement), regardless of whether such negligence, unseaworthiness or defective condition be active or passive, primary or secondary."

Rec. Doc. No. 29-4 at 4. SHRM purchased an insurance policy in accordance with the terms of the MSC from Defendant Lexington.

Attached to the copy of the MSC provided by Respondents is a

---

[3]Additionally, section 19 of the MSC states "As part of the consideration for this agreement, Contractor hereby agrees that the provisions of Paragraphs (8) Insurance, (9) Indemnity, (10) Loss of Contractor's Equipment and (14) Patent Infringement shall extend to and be enforceable by and for the benefit of any Owner or Operator for whom Company is performing work, activities, operations or services." (Rec. Doc. No. 29-4 at 6).

page entitled "Comments on MSA for Danos & Curole September 13, 2004" dated three days before the MSC became effective. (Rec. Doc. No. 36-3 at 1, 11). That document lists several allegedly requested changes to be made to prior drafts of the MSC, none of which currently exist; the third entry states "8.(B)(1)(c): Delete this section." *Id*. at 11. The bottom of the page bears the handwritten inscription "accepted 9/16/04 sent modified MSA to Dave Rusin for preparation." *Id*. Although this would appear to suggest an intent between the parties to delete the text of section 8.(B)(1)(c), there is no indication within the four corners of the agreement that the text of the section in the executed MSC is not as it was intended to be. Furthermore, section fourteen of the MSC appears to render the document listing "Comments on MSA" irrelevant. Section 14 states, in rather unambiguous terms:

> 14. In the event there is a conflict between the provisions hereof and any papers or documents, which may have been executed or passed between the parties hereto in connection with the subject matter hereof, it is understood and agreed that the provisions hereof shall be controlling. It is expressly understood and agreed by the parties hereto that no provision of any delivery ticket, invoice or other instrument used by Contractor in setting forth the work, activities and operations conducted hereunder shall superceded the provisions of this agreement.

Rec. Doc. No. 29-4 at 5-6.

## II. *Parties' Contentions*

### A. *Contentions of Movants*

Movants contend that under the terms of the OA, Power Marine

and D&C were "joint venturers and/or working together to market and operate the Dixie Patriot." (Rec. Doc. No. 29-1 at 3). Movants suggest that their ownership of the vessel coupled with their inability to operate same made their agreement with D&C to operate the vessel "a classic example of a joint venture." *Id*. Movants state that summary judgment is here appropriate as the terms both contracts are clear and unambiguous. *Id*. at 5. Movants state that, as the determination of ambiguity of a contract is a question of law, there exists no genuine issue of fact and, again, summary judgment is appropriate. *Id*. at 6. Movants argue that although the MSC does not contain a choice of law provision as the OA does, that the Fifth Circuit "has held that a [MSC] to provide offshore catering services to a vessel is a maritime contract and that the General Maritime Law must be applied in the absence of such a provision. *Id*.

Movants cite Fifth Circuit precedent to support the proposition that the indemnity provision of the MSC is valid and enforceable and then quote Section 9(A) *supra* arguing that its language is clear and unambiguous. *Id*. at 7. In fact, Movants state that "SHRM has agreed to indemnify [D&C] but not Power Marine under the terms of the [MSC]." (Rec. Doc. No. 29-1 at 13). Next, movants submit that they were a "joint venturer" with D&C within the meaning of Section 8(B)(1)(c) of the MSC and, thus are members

of the "Company Group" as outlined in the MSC and entitled to indemnity for the $350,000.000 paid by Commonwealth Insurance Co. as part of the settlement of the underlying Thomas litigation. Alternatively, Movants argue that if this Court finds then the OA did not create a joint venture between the parties, that "at the very least, [Power Marine] is a company 'for whom or with whom [D&C] is working' that also falls within the scope of the Company Group." (Rec. Doc. No. 29-1 at 12).

B. *Contentions of Respondents*

Respondents contend that "Power Marine seeks to take advantage of a specific provision of an indemnity contract to which it was not a party and which specific provision both of the actual parties to it have admitted was not intended to be included within the contract." (Rec. Doc. No. 36 at 2). Primarily, respondents suggest that section 8(B)(1)(c) of the MSC was left in by mistake, and that a question of mutual mistake is a factual issue sufficient to preclude summary judgment.[4] *Id.* at 3.

Respondents point to April 4, 2011 affidavit of Philip Fremin, Vice President of Finance and Administration for SHRM at the time in question and a signatory to the MSC. (Rec. Doc. No. 36-4 at 1-

---

[4] Respondents state that the "parties for whom or with whom [D&C] is working" language, in the MSC was "inadvertently not removed despite the parties' mutual intent to do so. Neither party was aware of this mistake until it was revealed during discovery in the instant litigation." (Rec. Doc. No. 36 at 4).

8

3). Fremin's affidavit states that during negotiations surrounding the MSC, he "requested on behalf of [SHRM] that certain portions of the MSC be revised . . . [specifically] the deletion of subparagraph 8.(B)(1)(c) 'parties for whom or with whom [D&C] is working . . . .'" *Id*. at 2. Fremin suggested this revision because, in his opinion "the phrase . . . is overly board and ambiguous and the parties to whom it may arguably be construed as applying could not be determined based on the face of the [MSC] or by reference to any established legal definitions." *Id*. However, no where in his affidavit does Fremin reconcile his statement that he "signed the [MSC] on behalf of [SHRM] on the belief that the referenced phrase had been removed" with the fact that he signed the MSC including that phrase. As important as removal of the phrase appears to have been to Respondents, there is no explanation other than reiterations of "mistake" to explain why it exists in the MSC signed and executed by both parties.[5]

Deposition testimony of Tommy Mayet, on behalf of D&C fails to show an intent on the part of D&C to remove the language at issue. As respondents point out, Mayet could not verify that he made every change on the "Comments to MSA" in fact, he stated that one of the

---

[5]Respondents later state that "[a]lthough the failure to delete the subject language could not be fully explained . . . both parties intended to do so and it is only by simple administrative mistake that the phrase . . . remained in the contract's final language." (Rec. Doc. No. 36 at 11).

two changes he could not verify were made was the entry requesting deletion of 8.(B)(1)(c). Mayet stated "I can't tell if that Number 8 had been removed for not. He just has, 'Delete this section, (B)(1)(c),' and I still have 8.(B)(1)(c), but the original (B)(1)(c) may have been deleted. I don't know." (Rec. Doc. No. 36-5 at 9). Later in his deposition testimony Mayet states that he "would assume . . . that all the changes were made to the body of the contract, including those two that I'm not sure of." *Id*. at 10. Respondents contend that "although the evidence is entirely one-sided" "there can be no genuine dispute that the parties [sic] mutually intended to remove the phrase . . . ." (Rec. Doc. No. 36 at 10).

In response to Section 14 of the MSC, Respondents state that they do not argue that the "Comments on MSA" paper should dictate obligations pursuant to the MSC but "rather, that the parties' mutual intent should control their obligations, and to the extent that the contract fails to reflect that intent as a result of mutual mistake, [the MSC] should be reformed." *Id*. Respondents then suggest that Fremin's testimony along with Mayet's notation at the bottom of the "Comments on MSA" paper "clearly establishes that the parties [sic] intended to remove the subject phrase . . . ." *Id*. Respondents then state that, under Louisiana law, parol evidence is admissible to show mutual mistake.

III. *Law and Analysis*

A.   *Summary Judgment Standard*

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986).  Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial.  *Webb v. Cardiothoracic Surgery Assocs. of N. Texas,* 139 F.3d 532, 536 (5th Cir. 1998).  The nonmovant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue.  *Id.*  Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment.  *Travelers Ins. Co. v. Liljeberg Enter., Inc.* 7 F.3d 1203, 1207 (5th Cir. 1993).

B.   *Applicable Law*

The Operating Agreement and Master Service Contract in the

instant case are maritime contracts, which are interpreted in accordance with general common-law principles of contract law. *See Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 703 (5th Cir.1961). A court looks first to the intent of the parties as expressed by the terms of the agreement(s). *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5thCir. 1986). The contractual language should be given its plain meaning unless the terms are ambiguous. *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir.1984). "The contract should be read as whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous." *Fontenot*, 791 F.2d at 1214. If the language is ambiguous, a court may consider extrinsic evidence to determine the parties' intent at the time of agreement. *Atlantic Lines, Ltd. v. Narwhal, Ltd.*, 514 F.2d 726, 730 (5th Cir.1975). When maritime law is silent about a question, the Court looks to general common law or, in some circumstances, state law.[6] "To the extent that it is not

---

[6] *See Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir.1986) ("Although state law may supplement maritime law where maritime law is silent, or where a local matter is at issue, state law may not be applied where it would conflict with maritime law.") (citations omitted); *Marastro Compania Naviera v. Canadian Maritime Carriers, Ltd.*, 959 F.2d49, 53 (5th Cir. 1992) (applying general common law, not state law, to issue of trespass because of the maritime law's principles of "uniformity and simplicity"); *Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 313-14 (1955)* ("In the field of maritime contracts, as in that of maritime torts, the National Government has left much regulatory power in the States."); *see also Ingersoll-Rand Fin. Corp. v. Employers Ins. of Wausau*, 771 F.2d 910, 912 (5th Cir. 1985) ("the interpretation of a contract of marine insurance is — in the absence of a specific and controlling federal rule — to be determined by reference to

inconsistent with admiralty principles . . . state contract law may be applied to maritime contracts." *Ham Marine, Inc. v. Dressler Indus., Inc.*, 72 F.3d 454,459 (5th Cir.1995).

Here, as both contracts are maritime contracts, the General Maritime law governs each and, to the extent such law is not applicable, Louisiana law governs.

C.   *Indemnity Provisions*

"[T]he construction of indemnity provisions in maritime contracts is governed by maritime law." *Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514, 1517 (5th Cir.1988) (citing *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-39 (5th Cir.1986)).

"Indemnity provisions should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Ebanks v. Offshore Liftboats, L.L.C.*, 2009 WL 3834365 (E.D.La. Nov. 10, 2009) (citing *Foreman v. Exxon Corp.*, 770 F.2d 490, 496 (5th Cir.1985) (stating that federal maritime law and Louisiana law were not different with regard to interpreting indemnity provisions)). When a motion for summary judgment concerns the interpretation of a contract, courts will construe the contract as a matter of law

---

appropriate state law"); *In re Torch, Inc.*, No. 94-2300, 2000 WL 798457, at *6 (E.D. La. June 21, 2000) ("where federal maritime law is silent, the Court will look to Louisiana law"); *Hebert v. Outboard Marine Corp.*, 638 F. Supp. 1166, 1170(E.D. La. 1986) ("When there is no uniform federal rule, courts applying maritime law may adopt state law by express or implied reference or 'by virtue of the interstitial nature of federal law.'").

"where the written instrument is so worded that it can be given a certain definite legal meaning or interpretation."  *Breaux v. Halliburton Energy Serv., Inc.*, 562 F.3d 358, 364 (5th Cir.2009). "Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court."  *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir.1998).

The language of the contracts at issue is unambiguous and thus, this court "should not look beyond the written language of the contract to determine the intent of the parties."  *Fontenot*, 791 F.2d at 1214.  Because of the express language of both the OA and MSC as discussed *supra*, the instant Motion for Summary Judgment should be and is herein granted.

New Orleans, Louisiana, this 26TH day of April, 2011.

_____
UNITED STATES DISTRICT JUDGE